503 S.E.2d 214

**The STATE, Respondent,**

v.

**Patricia KENNERLY, Appellant.**

**No. 2853.**

Court of Appeals of South Carolina.

Heard May 7, 1998.

Decided June 15, 1998.

Rehearing Denied Aug. 19, 1998.

444

446

Clyde C. Dean, Jr., Orangeburg, for appellant.

Attorney General Charles Molony Condon, Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley W. Elliott, and Assistant Attorney General Caroline C. Tiffin, Columbia; and Solicitor Walter M. Bailey, Jr., Orangeburg, for respondent.

HOWARD, Judge:

Patricia Kennerly appeals her conviction of criminal contempt. We affirm.

## I. FACTS

Kennerly was a juror in the capital murder trial of *The State v. Gregory Benjamin.* The *Benjamin* jury, which was sequestered during the trial, returned a verdict of guilty but did not impose a death sentence.

Three months after the *Benjamin* trial, the solicitor filed a petition alleging Kennerly was in contempt of court for: 1.) failing to disclose her relationship with Benjamin and/or his sister Tina Benjamin, who was a defense witness, during voir dire; and 2.) initiating premature discussions with other jurors

regarding her relationship with the Benjamins and her intent to vote for a life sentence in violation of the judge's instructions. The trial judge who presided over the *Benjamin* trial issued a rule to show cause based on the allegations in the petition. At Kennerly's request, the trial judge subsequently recused himself from hearing Kennerly's case.

Prior to the bench trial, Kennerly filed motions to dismiss the charges of contempt on the grounds that: 1.) the alleged contemptuous conduct occurred outside the presence of the court and therefore the rule to show cause was fatally defective because it was not supported by an affidavit or verified petition; and 2.) the State failed to comply with her *Brady* [1] and Rule 5, SCRCrimP, motions by not disclosing exculpatory statements made by Tina Benjamin to the solicitor's investigator. The trial court denied both motions.

At trial, the State called four witnesses, all members of the *Benjamin* jury.

Lamond Davis testified that on the second day of the guilt phase of the trial, Kennerly asked him if he could impose the death penalty. According to Davis, Kennerly then said, "Well, I'll give him life in jail." Davis also vaguely described the *Benjamin* trial judge's instructions given to the jury regarding premature deliberations.

Joyce Smith testified that Kennerly made similar statements to her at the motel where the jurors stayed during sequestration. Smith testified Kennerly spoke of being against the death penalty several times. According to Smith, Kennerly also stated that "she did not know how she had gotten picked to be a juror on this trial because she knew the sister of Gregory Benjamin, and that she lived on the same road, or the same area, she worked with her at the same plant, at one of the plants, and she just didn't know how she had even gotten picked to be on the jury." Smith testified Kennerly also commented on the credibility of one of the witnesses, claiming the witness lied in his testimony. All of these statements took place during the guilt phase. Smith also described the *Benjamin* trial judge's premature deliberations

---

1. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

instructions—"He would tell us every day not to talk about it ... [until] after everything was done."

Betty Parler testified that on the second day of the guilt phase, Kennerly stated to all the jurors at the conference table, "I really don't know why I'm here ... because I know the defendant's sister. I work by her and also we are neighbors."

Brian Parker testified that during the guilt phase of the trial, Kennerly told him that she knew Tina Benjamin, worked with Tina, and "wasn't really ... going with the death penalty." Parker stated he told Kennerly he didn't want to hear it "because the judge ruled that out" and they were not to talk about it.

At the conclusion of the State's case, the solicitor called attention to the *Benjamin* trial transcript, certain portions of which had been put into evidence. In particular, the transcript revealed that Kennerly was asked twice, once in the general voir dire and once during the individual voir dire, whether she knew any of the potential witnesses including Tina Benjamin. Kennerly informed the court that she knew some of the witnesses, however, she did not inform the court that she knew Tina.

The State did not introduce into evidence portions of the *Benjamin* trial transcript regarding the trial judge's premature deliberations instructions because those portions had not yet been transcribed. Instead, the State requested the trial court to take judicial notice of the jury instructions. It is not clear from the record whether the trial court did so. Ultimately, the State offered to have those portions transcribed, but the trial court informed the State that it did not need the transcript.

Kennerly then moved for directed verdict and renewed her motions to dismiss. The trial court denied the motions.

The defense called Tina Benjamin who testified she was not present in the courtroom during the jury selection and was never asked to stand up in front of the jury as a potential witness during voir dire. She further testified that she: did not know where Kennerly lived; had never worked side by side with Kennerly; did not know Kennerly; and had seen her

before the *Benjamin* trial only "in passing," such as at the local gas station. Kennerly did not testify.

The trial court found Kennerly guilty of contempt based on: 1.) her failure to disclose her relationship, however slight, with Gregory and Tina Benjamin; and 2.) her numerous violations of the *Benjamin* trial judge's instructions regarding premature deliberations. Kennerly was sentenced to six months imprisonment.

## II. ISSUES

A. Was Kennerly entitled to a dismissal of the charges against her based upon the lack of an affidavit or verified pleading supporting the rule to show cause?

B. Was Kennerly entitled to a dismissal of the charges against her based upon the State's failure to comply with her discovery motions?

C. Was Kennerly entitled to a directed verdict based upon the State's failure to prove the corpus delicti of the contempt regarding her relationship with the Benjamins?

D. Was Kennerly entitled to a directed verdict based upon the State's failure to introduce portions of the *Benjamin* trial transcript regarding the trial judge's premature deliberations instructions?

## III. DISCUSSION

### A. Rule to Show Cause

■ Kennerly contends the trial court erred in failing to dismiss the contempt charges on the ground that the rule to show cause was not based upon a sworn affidavit or a verified pleading alleging sufficient facts. She argues the alleged contempt occurred outside the presence of the court and, therefore, the solicitor's unverified petition was fatally defective. We disagree.

■ The inherent power of contempt, vested in the courts, is well established. In 1888, the United States Supreme Court commented:

[C]ourts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum in their presence, and submission to their lawful mandates.... "The power to punish for contempts is inherent in all courts. Its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts; and consequently to the due administration of justice. The moment the courts of the United States were called into existence and invested with jurisdiction over any subject, they became possessed of this power." And such is the recognized doctrine in reference to the powers of the courts of the several states.... "The power to punish for contempt is inherent in the nature and constitution of a court. It is a power not derived from any statute, but arising from necessity; implied, because it is necessary to the exercise of all other powers." Without such power, ... the administration of the law would be in continual danger of being thwarted by the lawless.

*In re Terry*, 128 U.S. 289, 303, 9 S.Ct. 77, 32 L.Ed. 405 (1888) (citations omitted) (quoted with approval in *State v. Goff*, 228 S.C. 17, 22–23, 88 S.E.2d 788, 790–91 (1955)). Contemptuous behavior is conduct that tends to: bring the authority and administration of the law into disrespect; or, interfere with or prejudice parties or their witnesses during litigation. *State v. Weinberg*, 229 S.C. 286, 92 S.E.2d 842 (1956). The power of contempt exists to maintain the order and decorum of court proceedings, to enforce the court's writs and orders, and to punish acts tending to obstruct the due administration of justice. *Id.*

In this criminal contempt proceeding, the pivotal question raised by Kennerly's first issue is whether her alleged misconduct constitutes direct or constructive contempt.

Direct contempt is defined as contemptuous conduct occurring in the presence of the court. *State v. Goff*, 228 S.C. 17, 88 S.E.2d 788 (1955). South Carolina courts have liberally applied the "presence" requirement such that "[w]hen the [c]ourt is in session, in order to extend its protection to its officers, jurors and witnesses, it must be considered to be present where those persons are required to be in the performance of their several duties." *Id.* at 23, 88 S.E.2d at 791.

The court "consists not of the judge, the courtroom, the jury, or the jury room individually, but of all of these combined. The court is present wherever any of its constituent parts is engaged in the prosecution of the business of the court according to law." *Id.* at 24, 88 S.E.2d at 792 (categorizing the defendant's conduct as direct contempt where he harassed a witness during a civil trial on the courthouse steps after the witness had testified against the defendant).

■ Constructive contempt is contemptuous conduct occurring outside the presence of the court. *Toyota of Florence, Inc. v. Lynch,* 314 S.C. 257, 442 S.E.2d 611 (1994) (categorizing the defendants' conduct as constructive contempt where they created pretrial publicity a week before trial); *State v. Weinberg,* 229 S.C. 286, 92 S.E.2d 842 (1956) (categorizing the defendant's conduct as constructive contempt where he attempted to influence potential jurors on behalf of his son who was charged in a pending criminal case).

■ The distinction between direct and constructive contempt is important because it determines how the contempt proceedings must be brought.[2] "Charges of constructive contempt are brought by a rule to show cause which must be based upon an affidavit or verified petition. The failure to support the rule to show cause by an affidavit or verified petition is a fatal defect." *Lynch,* 314 S.C. at 267, 442 S.E.2d at 617 (citation omitted). A rule to show cause for direct contempt may be issued without a supporting affidavit or verified petition.

We conclude Kennerly's actions were committed in the presence of the court and, therefore, constituted direct con-

---

2. The categories that have been drawn in the analysis of contempt proceedings are varied, depending upon the issue under consideration. The same terms may have different meanings depending upon the question to be resolved. Thus, for example, the distinction between direct and constructive contempt, for purposes of how a contempt proceeding must be brought, does not determine when a defendant in a criminal contempt proceeding must be afforded a hearing and other due process rights. The determination of those issues requires separate inquiries. *See International Union v. Bagwell,* 512 U.S. 821, 114 S.Ct. 2552, 129 L.Ed.2d 642 (1994) (criminal contempt is a crime and criminal penalties cannot be imposed where defendant has not been afforded protections the Constitution requires in criminal proceedings). *See generally* 17 Am.Jur.2d *Contempt* §§ 193 to 203 (1990).

tempt. The failure to disclose her relationship with the Benjamins during voir dire clearly occurred in the presence of the court. Kennerly's premature deliberations in the jury room and at the jury's hotel also occurred in the presence of the court because the jury was required to be in those places to perform the duties of the court. Therefore, the trial court did not err in denying Kennerly's motion to dismiss on this ground.

## B. *Brady* and Rule 5

■ Kennerly contends the trial court erred in failing to dismiss the contempt charges on the grounds that the State failed to comply with her *Brady* and Rule 5, SCRCrimP, motions by not disclosing exculpatory statements made by Tina Benjamin to the solicitor's investigator. We disagree.

A solicitor's investigator interviewed Tina Benjamin prior to Kennerly's trial. During the interview, Tina told the investigator substantially what she ultimately testified to at trial. The State did not disclose this information to Kennerly. As a result, Kennerly was compelled to hire a private investigator to find Tina and gather this information.

The rules encompassed in *Brady,* and its progeny, and Rule 5 are separate and impose different duties. Therefore, separate analysis must be used to determine if either has been violated.

■ The *Brady* disclosure rule is grounded in the defendant's fundamental right to a fair trial mandated by the Due Process Clause of the Fifth and Fourteenth Amendments. It requires the prosecution to disclose evidence that is: 1.) in its possession; 2.) favorable to the accused; and 3.) material to guilt or punishment. *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976); *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The prosecution has the duty to disclose regardless of whether the defendant makes a specific request. *Bagley, supra.* This rule extends to evidence that is not in the actual possession of the prosecution but known by others acting on the government's behalf in the particular case, including the police. *Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d

490 (1995). "Favorable" evidence includes both exculpatory and impeachment evidence. *Bagley, supra.* "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley,* 473 U.S. at 682, 105 S.Ct. 3375. Once a *Brady* violation is established, reversal is required. *Kyles, supra.*

In a *Brady* analysis, information is not deemed "material" if the defense discovers the information in time to adequately use it at trial. In Kennerly's case, we conclude there was no *Brady* violation because Kennerly discovered the information at issue and used it at trial by calling Tina Benjamin as a witness, despite the State's failure to disclose the information. Therefore, the exculpatory statements made by Tina Benjamin to the solicitor's investigator are not "material" for purposes of *Brady.* Since the information was used by Kennerly at trial, there is nothing to suggest that the result of her trial would have been different had the State disclosed the information to her.

The requirements of Rule 5, as opposed to the constitutional dictates of *Brady,* are judicially created discovery mechanisms for use in criminal proceedings. Rule 5(a)(1)(C) requires:

> Upon request of the defendant the prosecution shall permit the defendant to inspect and copy books, papers, documents, photographs, tangible objects, buildings or places, or copies or portions thereof, which are within the possession, custody or control of the prosecution, and which are material to the preparation of his defense or are intended for use by the prosecution as evidence in chief at the trial, or were obtained from or belong to the defendant.

This rule clearly applies to evidence within the actual possession of the prosecution and seems to also apply to evidence within the possession of other government agencies. *See State v. Gulledge,* 326 S.C. 220, 487 S.E.2d 590 (1997). The definition of "material" for purposes of Rule 5 is the same as the definition used in the *Brady* context. *See Fradella v. Town of Mount Pleasant,* 325 S.C. 469, 482 S.E.2d 53 (Ct.App. 1997) (per curiam). Once a Rule 5 violation is shown, reversal

is required only where the defendant suffered prejudice from the violation. *State v. Trotter*, 322 S.C. 537, 473 S.E.2d 452 (1996); *State v. Wilkins*, 310 S.C. 81, 425 S.E.2d 68 (Ct.App. 1992).

We also conclude there was no Rule 5 violation. Tina Benjamin's statements are likewise not "material" for purposes of Rule 5. Furthermore, this information was not intended for use by the State as evidence in chief at trial and was not obtained from Kennerly.

Despite the different underpinnings of *Brady* and Rule 5, each has the same goal of ensuring the criminal defendant's right to a fair trial. Neither is designed "to displace the adversary system as the primary means by which truth is uncovered, but [rather] to ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675, 105 S.Ct. 3375. Furthermore, "the prosecutor's role transcends that of an adversary [because] he 'is the representative not of an ordinary party to a controversy, but of a sovereignty ... whose interest ... in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* at n. 6 (quoting *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935)). Taking this into consideration and understanding that "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108, 96 S.Ct. 2392.

### C. Corpus Delicti

Kennerly contends the trial court erred in denying her motion for directed verdict on the ground the State failed to establish the corpus delicti. However, she never raised the corpus delicti issue to the trial court and failed to raise it at the time of her motion. Therefore, this issue is not preserved for our review. *E.g., State v. Morgan*, 282 S.C. 409, 319 S.E.2d 335 (1984) (where the trial court had no opportunity to rule on the issue of corpus delicti, the issue is not preserved for appellate review).

### D. State's Failure to Introduce Premature Deliberations Instructions

Kennerly also contends the trial judge erred in denying her motion for directed verdict based on the State's

failure to introduce into evidence portions of the *Benjamin* trial transcript regarding the trial judge's premature deliberations instructions. She argues that without having the specific language of the premature deliberations instructions, the trial court did not have sufficient evidence to find her guilty of contempt. However, Kennerly did not raise this issue to the trial court in her directed verdict motion. Instead, she simply moved for a directed verdict without stating any specific grounds. In reviewing a denial of directed verdict, issues not raised to the trial court in support of the directed verdict motion are not preserved for appellate review. *State v. Jordan*, 255 S.C. 86, 177 S.E.2d 464 (1970). A defendant cannot argue on appeal an issue in support of his directed verdict motion when the issue was not presented to the trial court below. *See State v. Bailey*, 298 S.C. 1, 5, 377 S.E.2d 581, 584 (1989) ("A party cannot argue one ground for a directed verdict in trial and then an alternative ground on appeal.").

## IV. CONCLUSION

For the foregoing reasons, Kennerly's conviction is **AFFIRMED.**

HEARN and ANDERSON, JJ., concur.